UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CARDIOFOCUS, INC. | ) |
| | ) |
| Plaintiff, | ) Civil Action No.1: 08-cv-10285NMG |
| v. | ) |
| | ) |
| CANDELA CORPORATION, ET AL. | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT, CARDIOGENESIS CORPORATION'S MOTION TO EXCLUDE
PORTIONS OF EXPERT REPORT AND TESTIMONY OF PLAINTIFF'S
DAMAGES EXPERT JOSEPH GEMINI**

795356

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

STANDARD OF REVIEW .................................................................................. 2

ARGUMENT ....................................................................................................... 3

    A.    Gemini's Arbitrary Doubling Of The Reasonable Royalty Rate To 10% Is Not Based On A Reliable Methodology Or Relevant Evidence And Should Be Excluded. ........................................................... 3

    B.    Mr. Gemini's Application of a Royalty Rate Against Cardiogenesis' Gross Profits, Instead of Net Profits, Should Be Excluded. .................................................................................................. 10

    C.    Gemini's Opinions Are Contrary To His Own Professional Practices .................................................................................................... 13

    D.    Gemini Should Be Precluded From Offering An Opinion Regarding The Application Of The Book Of Wisdom ............................ 15

CONCLUSION .................................................................................................... 18

REQUEST FOR ORAL ARGUMENT ............................................................... 18

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>CASES</u>

*Accord Del Mar Avionics, Inc. v. Quinton Instrument Co.*,
   836 F.2d 1320 (Fed. Cir. 1987)...........................................................................4

*Andrew Corp. v. Gabriel Elecs., Inc.*,
   785 F.Supp. 1041 (D. Me. 1992) .......................................................................12

*Applied Medical Resources Corp. v. U.S. Surgical Corp.*,
   435 F.3d 1356 (Fed. Cir. 2006) .........................................................................13

*Bose v. JBL, Inc.*,
   112 F.Supp.2d 138 (D. Mass. 2000) ....................................................................5

*Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*,
   No. 02-12146, 2012 WL 118486 (D. Mass. Jan. 13, 2012)...................... 3, 16

*Brine, Inc. v. STX, L.L.C.*,
   367 F.Supp.2d 61 (D. Mass. 2005) .....................................................................13

*Clark v. Wooster*,
   119 U.S. 322 (1886) ..............................................................................................4

*Cohesive Techs. v. Waters Corp.*,
   526 F.Supp.2d 84 (D. Mass. 2007) ......................................................................5

*Dataquill v. High Tech Computer Corp.*,
   2011 WL 6013022 (S.D. Cal. Dec. 1. 2011)......................................................10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   \509 U.S. 578 (1993)..................................................................................... passim

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co Ltd.*,
   No. 88-1814, 1993 WL 1510657 (D. Mass. Apr. 27, 1993) .......................6

*Fromson v. Western Litho Plate & Supply Co.*,
   853 F.2d 1568 (Fed. Cir. 1988).................................................................. 18, 20

*Frymire-Brinati v. KPMG Peat Marwick*,
   2 F.3d 183 (7th Cir. 1993) ..................................................................................16

*General Elec. Co. v. Joiner*,
   522 U.S. 136, 146 (1997)...............................................................................8, 9

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970)....................................................................12

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
   185 F.3d 1341 (Fed. Cir. 1999)...........................................................................10

*Hanson v. Alpine Valley Ski Area, Inc.*,
   718 F.2d 1075 (Fed. Cir. 1983)................................................................... 5, 13

*Hynix Semiconductors, Inc. v. Rambus, Inc.,*
  2006 WL 1991760 (N.D. Cal. Jul. 14, 2006).............................................................. 9

*Interactive Pictures Corp. v. Infinite Pictures, Inc.,*
  274 F.3d 1371 (Fed. Cir. 2001).................................................................................. 15

*IP Innovation L.L.C. v. Red Hat, Inc.,*
  705 F.Supp.2d 687 (E.D. Tex. 2010) ......................................................................... 10

*Jesionowski v. Beck,*
  955 F.Supp. 149 (D. Mass. 1997) ................................................................................ 3

*Ji v. Bose Corp.,*
  538 F.Supp.2d 354 (D. Mass. 2008) ............................................................................ 2

*Kumho Tire Co. v. Carmichael,*
  526 U.S. 137 (1999).............................................................................................. 16, 17

*Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.,*
  895 F.2d 1403 (Fed Cir. 1990)................................................................................... 13

*Lucent Techs., Inc. v. Gateway, Inc.,*
  580 F.3d 1301 (Fed. Cir. 2009)........................................................................... 4, 5, 6

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.,*
  476 F.Supp.2d 1143 (N.D. Cal. 2007) ......................................................................... 3

*Monsanto Co. v. McFarling,*
  488 F.3d 973 (Fed Cir. 2007)...................................................................................... 4

*Pall Corp. v. Micron Separations,*
  66 F.3d 1211 (Fed Cir. 1995)..................................................................................... 12

*Polaroid Corp. v. Eastman Kodak Co.,*
  No. 76-1634, 1990 WL 324105 (D. Mass. Oct. 12, 1990) ........................................... 6

*ResQNet.com, Inc. v. Lansa, Inc.,*
  594 F.3d 860 (Fed. Cir. 2010)...................................................................................... 6

*Riles v. Shell Exploration & Production Co.,*
  298 F.3d 1302 (Fed. Cir. 2002)..................................................................... 9, 12, 14

*Rite-Hite Corp. v. Kelley Co., Inc.,*
  56 F.3d 1538 (Fed. Cir. 1995)...................................................................................... 5

*Rude v. Westcott,*
  130 U.S. 152 (1889)..................................................................................................... 4

*Russell Box Co. v. Grant Paper Box Co.,*
  203 F.2d 177  (1st Cir. 1953)....................................................................................... 5

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.,*
  750 F.2d 1552 (Fed. Cir. 1984)................................................................................... 15

*TWM Manufacturing Co. v. Dura Corp.,*
  789 F.2d 895 (Fed. Cir. 1986)..................................................................................... 18

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011).......................................................................... passim

*Unisplay, S.A. v. American Elec. Sign Co.*,
  69 F.3d 512 (Fed. Cir. 1995) ............................................................................... 6

## STATUTES

35 U.S.C. § 284 ......................................................................................................... 4

Federal Rules of Evidence 401 ............................................................................ 1, 20

Federal Rules of Evidence 402 ............................................................................ 1, 20

Federal Rules of Evidence 403 ............................................................................ 1, 20

Federal Rules of Evidence 702 ................................................................. 1, 2, 17, 20

Federal Rules of Evidence 703 ..................................................................... 1, 2, 20

## OTHER AUTHORITIES

BLACK'S LAW DICTIONARY (9th Ed.) ....................................................................... 13

Local Rule 7.1(D) ................................................................................................... 20

Paul M. Janicke and Lilan Ren, "Who Wins Patent Infringement Cases" AIPLA
  Quarterly Journal, Vol. 34, No. 1, Winter 2006, 1-43, at 5 ............................... 7

Defendant Cardiogenesis Corporation moves to strike significant portions of the expert report of Mr. Joseph Gemini, damages expert for Plaintiff CardioFocus, Inc.  This report fails to meet the standards for expert opinion and testimony established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 578 (1993) and as set forth in Federal Rules of Evidence 401, 402, 403, 702, and 703.

## INTRODUCTION

On December 2, 2011, CardioFocus served the damages expert report of Mr. Gemini (attached as Ex. B to Declaration of Stephen Vegh).  Mr. Gemini opines that CardioFocus is entitled to a reasonable royalty of $9.6 million for infringement by Cardiogenesis of its patents. Mr. Gemini reaches this conclusion by employing the same method for calculation of damages – a hypothetical arms-length transaction – used by the damages expert for Cardiogenesis, John Jarosz, but Gemini adjusts the rate upward because, in his opinion, a 10% royalty is more reflective of what a hypothetical bargain would render.  As well, the 10% running royalty would apply to Defendant's gross profits instead of net profits.  This "opinion" is inadmissible.

*First*, Mr. Gemini acknowledges that contemporary license agreements for CardioFocus' patents and other related patents contain a 3% royalty rate, but chooses to arbitrarily ignore them for purposes of his calculation.  Then Gemini takes the 5% rate in two agreements and claims it should be doubled based on an uncertainty discount implied from random odds of success in patent litigation identified in two academic studies.  Because this 100% rate mark-up stems from a methodology that is not scientifically proven or reliable, not based on relevant evidence, and is untethered to the factual and economic realities of this case, Mr. Gemini's proposed expert testimony about a reasonable royalty should be rejected under *Daubert* and its progeny.

*Second*, Mr. Gemini's attempt to apply his inflated royalty rate to Cardiogenesis' gross profits is not based on any explained methodology or accepted standard, other than to reach the highest damages figure he can.

*Third*, Mr. Gemini's proposed damages calculation methodology does not comport with the intellectual rigor required by his own professional practice as an accountant.

*Fourth*, Mr. Gemini should be precluded from testifying about any opinion regarding the "book of wisdom" theory espoused by Mr. Jarosz. Mr. Gemini was aware of Mr. Jarosz's report long before his deposition and yet expressed no opinion about the book of wisdom concept. Any testimony at trial by Mr. Gemini on this topic would be impermissible new opinion testimony not previously disclosed. If Mr. Gemini is allowed to so testify, Cardiogenesis should be granted leave to depose him on any proposed new testimony.

## STANDARD OF REVIEW

A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if the testimony is based on sufficient facts or data, and based on reliable principles and methods applied reliably. See FED. R. EVID. 702. Expert opinion based on methodologies that are scientifically unreliable and on data upon which no reasonable expert would rely is inadmissible. See FED. R. EVID. 702, 703; *see also Ji v. Bose Corp.*, 538 F.Supp.2d 354, 357 (D. Mass. 2008) (Gorton, J.) ("The Court's role is to determine whether the expert possesses some specialized knowledge such that his or her testimony will be helpful to the trier of fact and, if so, whether that knowledge arises from reliable methods applied in a reliable manner."). A damages expert, in particular, must sufficiently "tie the expert testimony on damages to the facts of the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (citing *Daubert*) (internal punctuation marks omitted); *Integra Lifesciences, Ltd. v. Merck KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2003) ("although an exercise in approximation," the hypothetical negotiation analysis "must be based on sound economic and factual predicates"), *vacated on other grounds*, 545 U.S. 193 (2005). After *Uniloc*, in order to be admissible, any evidence considered in a reasonable royalty analysis "must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time." *Uniloc*, 632 F.3d at 1315. "[A]n expert report on damages, including a reasonable royalty analysis, may not rely on unreasonable inferences or resort to 'mere speculation or guess.'" *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 476 F.Supp.2d 1143,

1154 (N.D. Cal. 2007).

Because expert testimony can "be both powerful and misleading," the Supreme Court emphasized the "gatekeeping responsibility" federal judges have over the admission of expert testimony. *Daubert*, 509 U.S. at 595, 597; *see Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, No. 02-12146, 2012 WL 118486, at *3 (D. Mass. Jan. 13, 2012) (Gorton, J.) ("The Court must be vigilant in exercising its gatekeeper role because of the latitude given to expert witnesses to express their opinions on matters about which they have no firsthand knowledge and because an expert's testimony may be given substantial weight by the jury due to the expert's status."). As the proponent of the expert, CardioFocus has the burden of proving admissibility. *Jesionowski v. Beck*, 955 F.Supp. 149, 150 (D. Mass. 1997).

## ARGUMENT

### A. Gemini's Arbitrary Doubling Of The Reasonable Royalty Rate To 10% Is Not Based On A Reliable Methodology Or Relevant Evidence And Should Be Excluded.

Under the Patent Act, if plaintiff establishes infringement, it is entitled to an award of "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. In addition, the Court is authorized to "receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances." *Id.* A patentee bears the burden of proving damages by a preponderance of evidence. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009); *Dow Chem. Co., v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003). To properly carry this burden, the patentee must "sufficiently [tie the expert testimony on damages] to the facts of the case." *Daubert*, 509 U.S. at 591. If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded. *Uniloc*, 632 F.3d at 1315.[1]

---

[1] As discussed below, Mr. Gemini's expert opinions regarding a reasonable royalty for patent damages have been the subject of exclusion orders in several federal courts, including in *Uniloc*.

An "established royalty is usually the best measure of a 'reasonable' royalty for a given use of an invention because it removes the need to guess at the terms to which parties would hypothetically agree." *Monsanto Co. v. McFarling*, 488 F.3d 973, 978-79 (Fed Cir. 2007).[2] *Accord Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1328 (Fed. Cir. 1987) ("it is reasonable to assume that this [established] royalty is a fair measure of the actual damage to a patent owner who has authorized others to practice the patented invention"); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983) ("The reasonable royalty may be based upon an established royalty, if there is one"); *Russell Box Co. v. Grant Paper Box Co.*, 203 F.2d 177, 182-83 (1st Cir. 1953) (Judge Wyzanksi was "fully justified in refusing to put [the infringer] in a more favorable position than [the patent owner's] licensees" by using established rate as reasonable royalty).[3]

In this case, plaintiff's expert, Mr. Gemini, has adopted the "hypothetical negotiation" approach to computing a reasonable royalty, under which he has "attempt[ed] to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before the infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009); *see also Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc) ("A reasonable royalty analysis is based on a hypothetical negotiation . . . of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began."). "The hypothetical negotiation also assumes that the

---

[2] *See, e.g., Rude v. Westcott*, 130 U.S. 152, 165 (1889) ("It is undoubtedly true that where there has been such a number of sales by a patentee of licenses to make, use and sell his patents, as to establish a regular price for a license, that price may be taken as the measure of damages against infringers"); *Clark v. Wooster*, 119 U.S. 322, 326 (1886) ("It is a general rule in patent causes that established license fees are the best measure of damages that can be used.").

[3] *See also Bose v. JBL, Inc.*, 112 F.Supp.2d 138, 165 (D. Mass. 2000) ("To determine a reasonable royalty rate, a court looks first for an established royalty applicable to the patent at issue."); *Cohesive Techs. v. Waters Corp.*, 526 F.Supp.2d 84, 121-22 (D. Mass. 2007) (court may calculate royalty rate relying "upon an established royalty rate within the relevant market, if there is one"), *rev'd in part on other grounds*, 543 F.3d 1351 (Fed. Cir. 2008).

asserted patent claims are valid and infringed." *Lucent Technologies, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1325 (Fed. Cir,. 2009) (emphasis added).[4]   The "hypothetical reasonable royalty calculation occurs before litigation." *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 872 (Fed. Cir. 2010).

Undertaking his analysis, Mr. Gemini begins with the licensing agreements for CardioFocus' patents with two companies – Dornier and WaveLight – which established royalty rates between a willing licensor and licensees outside of the context of litigation.  Vegh Dec., Ex. "B", Gemini Report at 14 ¶ 35.  Those royalty rates range from 3% to 5% of net sales, depending upon the types of products involved.  Vegh Dec., Ex. "B", Gemini Report at 14-15.  Mr. Gemini also cites a rate of 3% of net sales in a licensing agreement between Rare Earth and C.R. Bard for patents "related to" CardioFocus' patents.  *Id.* at 15-16.

Rather than applying these established rates of 3% and 5% to net profits here, Mr. Gemini first discards the 3% rate in the Dornier and Rare Earth agreements without explanation or any reasoned methodology, violating the well-established principle that a patentee's prior license agreements "should carry considerable weight in calculating a reasonable royalty rate." *See Unisplay, S.A. v. American Elec. Sign Co.,* 69 F.3d 512, 519 (Fed. Cir. 1995).  Instead, Mr. Gemini claims that the remaining 5% rate should be doubled to 10% because there was a "degree of uncertainty" as to the validity and infringement of when CardioFocus negotiated those rates at arms-length, resulting in a 50% uncertainty discount in the negotiated rate.  Vegh Dec., Ex. "B", Gemini Report at 16.  Because the patents are assumed valid and infringed in this case, a

---

[4] *See, e.g., Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co Ltd.*, No. 88-1814, 1993 WL 1510657, at *22 (D. Mass. Apr. 27, 1993) ("a reasonable royalty… is characterized as the amount that would have been set at the time the infringement began between a hypothetical willing patent owner and a willing potential licensee, assuming that the patent was valid and enforceable."); *Polaroid Corp. v. Eastman Kodak Co.*, No. 76-1634, 1990 WL 324105, at *74 (D. Mass. Oct. 12, 1990) ("In these hypothetical negotiations, we must consider the patents valid and infringed and that the parties were fully informed as to this fact.").

hypothetical negotiation would render a rate "approximately 2 to 4 times higher." (i.e., 10-20%) *Id.* Mr. Gemini bases the doubling of the royalty rate to 10% on two "studies" which "indicate that a royalty rate for a proven valid and infringed patent can be estimated reasonably based upon [roughly 50%] expectations of success of the patented owner [in litigation], and *impl[y]* rates of 2-4 times the negotiated rates." Vegh Dec., Ex. "B", Gemini Report at 16 n.59-60, and 25, ¶ 43 (emphasis added). Mr. Gemini adds: "[a]ccording to these studies, the success rate for a patent owner is 45% based upon the trial study and 25% based on the all dispositions study." Vegh Dec., Ex "B", Gemini Report at ¶ 37.

Mr. Gemini's doubling of royalty rates based on implication does not pass for valid scientific knowledge. His "studies" are, in fact, surveys of random patent case results which acknowledge their limitations. *See* Paul M. Janicke and Lilan Ren, "Who Wins Patent Infringement Cases" AIPLA Quarterly Journal, Vol. 34, No. 1, Winter 2006, 1-43, at 5 (examining 262 patent cases during the period from 2002 to 2004 and "deliberately omit[ing] what many might consider the most important variable, legal strength of the parties' respective positions, in order to look at other factors apart from any subjective perceptions of the factual and legal merits of the parties' positions.") (attached to Vegh Dec as Ex. "D".). Most relevant to this Court's analysis following *Uniloc*, the Janicke study concluded: "Indeed, we have been assuming that the strength of the parties' positions with respect to the facts and law were equal in all cases and therefore did not influence outcomes. In reality that assumption of course does not hold, as each parties' evidence and arguments have different strengths under doctrinal patent and procedural law; these could, and traditionally should, be controlling factors." *Id.* at 19. Mr. Gemini does not dispute the inherent weaknesses in applying the Janicke study to this case. See Vegh Dec. Ex. "A", Gemini Deposition, 231:1-232:14.

Mr. Gemini makes no effort to explain how any economic, legal or statistical

methodology allows accountants to quantify reasonable royalty rates based on the random odds of successfully litigating a patent infringement case. *See* Vegh Dec., Ex. "A", Gemini Depo at 213-15 (Gemini unaware of any other peer-reviewed scientific literature supporting his theory for doubling damages). Plaintiff cannot cite to any legal precedent accepting such a damages methodology, rendering it wholly speculative. *See Daubert*, 509 U.S. at 593 ("Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested."). Gemini's enhancement of the observed royalty rates in the Dornier and Wavelight agreements by two-fold to 10% is punitive, arbitrary, and irrelevant to this proceeding, as this methodology bears no relation to the facts of this case as demanded by the Federal Circuit. *Uniloc*, 632 F.3d at 1318.

In light of the lack of scientific support for Gemini's theory, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see Daubert*, 509 U.S. at 590 (expert testimony must connote "more than subjective belief or unsupported speculation"). Gemini's application of the Teece and Janicke studies to this case do not pass muster after *Uniloc*.

On the contrary, one court has already rejected Mr. Gemini's attempt to replicate the damages testimony of his chosen survey author, Professor Teece. In a patent case involving a reasonable royalty calculation for memory chips, Prof. Teece "implied that elimination of uncertainty could have the effect of doubling the royalty rates" based on a "50-50 chance" that "litigated patents are found valid." *Hynix Semiconductors, Inc. v. Rambus, Inc.*, 2006 WL 1991760, at *2 (N.D. Cal. Jul. 14, 2006). The court ruled that Teece's surveys – which Mr. Gemini relies on here – were "statistically insignificant and did not provide a valid legal basis to support an expert opinion quantifying the uncertainty discount." *Id.* at *2 n.3. As well, the court

rejected the attempt to award damages based on a royalty rate above the established license agreement in evidence because Teece's proposed increase was "speculative and subject to conjecture." *Id.* at *4.

As in *Hynix*, this Court should reject plaintiff's attempt to inflate its alleged damages by 100% by using statistically insignificant, unscientific survey data to quantify a discount which licensees should pay for not having to deal with the vagaries of patent litigation.  Mr. Gemini's result is unsupported by any "sound economic and factual predicates".  *Riles v. Shell Exploration & Production Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).  In other words, there is "too great an analytical gap" between Gemini's random survey data and his speculative discount theory. *Joiner,* 522 U.S. at 144.  This Court has good reason to join the other courts which have rejected Mr. Gemini's damages testimony because he "arbitrarily picked a royalty rate that is much higher than the existing royalty rates to the patents-in-suit."  *IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F.Supp.2d 687, 690-91(E.D. Tex. 2010) (finding that Mr. Gemini's failed to offer "credible economic approach" in relying on increased rates in broad industry studies without demonstrating any link to actual patents at issue or existing established rates); *see also Dataquill v. High Tech Computer Corp.*, 2011 WL 6013022, at *22 (S.D. Cal. Dec. 1. 2011) (excluding Gemini opinion for failing to offer "evidence or analysis showing that [certain existing agreements with high royalty rates] are economically comparable to the license that would be reached at the hypothetical negotiation").

Even if somehow valid, Mr. Gemini's methodology properly cannot be applied to the facts in issue here.  Courts require "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture" in all damages calculations. *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).  Here, there is no evidence regarding patent infringement lawsuit success in the laser catheter or broader

8

healthcare technology markets, whether 25% or 45% or any other percentage. There are no facts in this case for Mr. Gemini to justify a conclusion that CardioFocus' actual licensing agreement rates were specifically discounted by 50%.

Indeed, Mr. Gemini cannot apportion what part of the 10% royalty rates accounts for the uncertainty purportedly built into the rates of the Dornier and Wavelight agreements. Vegh Dec., Ex. "A", Gemini Depo at 210-11. Nor could Mr. Gemini apportion what percentage of the increase to the 10% royalty rate was due to additional compensation in the form of initial payments and transfer fees set forth in the Dornier agreement. *Id.*[5] Moreover, Mr. Gemini's purported "uncertainty discount" fails to reflect that the 3% and 5% rates in CardioFocus' agreement with Dornier established in 1999 were renewed in 2006 as part of a settlement agreement between the parties. In fact, Mr. Gemini does not dispute that these royalty rates remained unchanged between CardioFocus and Dornier from 1999 to 2006. Vegh Dec., Ex. "A", Gemini Depo, 174:18-175:16. *See* Aug. 2006 Confidential Settlement Agreement and Mutual Release (CARD-CA001959-68, ¶ 3.2 at 63, ¶ 4.2 at 64 (Vegh Dec., Ex. "C") (agreeing not to challenge CardioFocus' patents); Vegh Dec., Ex. "A", Gemini Depo at 182:1-4 (if release language prevented Dornier from challenging validity of patent rights, then there may not have been discount for validity in the royalty rates negotiated in the 1999 Dornier agreement).

Finally, Mr. Gemini contends that "Cardiogenesis would be willing to pay a premium over Dornier and WaveLight for the '073 technology in that this technology would be more important to Cardiogenesis due to the broader scope and the significance of the accused products to Cardiogenesis' business." See Vegh Dec., Ex. "B", Gemini Report at 25, ¶ 43. However, the assessment of a 10% royalty rate for the accused products (which are nearly all the products

---

[5] The CardioFocus-Dornier agreement provided for a modest up-front "License Issue Fee" of $150,000 and the transfer of three lasers valued at approximately $200,000. See Gemini Report at ¶35.

9

Cardiogenesis sold) would have more than eliminated what little profit Cardiogenesis made during the 2002-2007 time period. Vegh Dec., Ex. "A", Gemini Depo at 281:8-14; 281:16-282:1; 287:3-8; 287:12-18. Such a royalty is not reasonable and would not have been the product of a good faith hypothetical negotiation. *See Andrew Corp. v. Gabriel Elecs., Inc.*, 785 F.Supp. 1041, 1054 (D. Me. 1992) ("Even though the reasonable royalty is a legal fiction, the Court cannot countenance a rate which would never have been negotiated by a willing patent holder and a willing license seeker.").

As a result, Mr. Gemini's failure to demonstrate how his 50% uncertainty discount theory and resulting 10% royalty rate are reliable or relevant to the facts of this case renders these "opinions" excludable under *Daubert* and *Uniloc* because they are not based on reliable economic methods or factual predicates, particularly with the established rates of 3% and 5%, the renewal of the Dornier rates in a "settlement agreement," and the reality of Cardiogenesis' significant economic losses during the relevant time period of 2002-2007. Therefore, this Court should exclude Mr. Gemini from presenting his opinions on the "reasonableness" of a royalty rate doubled from established license rates. *See Uniloc*, 632 F.3d at 1315 (excluding Mr. Gemini's "fundamentally flawed" reasonable royalty rate because it was not tied to the facts of the case at issue as required by *Daubert* and FRE).

B.     **Mr. Gemini's Application of a Royalty Rate Against Cardiogenesis' Gross Profits, Instead of Net Profits, Should Be Excluded.**

As patent infringement damages, fair reasonable royalties "by definition, make the patentee whole, as opposed to punishing the infringer." *Riles*, 298 F.3d at 1312; *see Pall Corp. v. Micron Separations*, 66 F.3d 1211, 1223 (Fed Cir. 1995) ("the purpose of compensatory damages is not to punish the infringer, but to make the patentee whole."). This is consistent with factor 15 in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970),

which provides that a "reasonable royalty is the amount that a person, desiring to manufacture, use, or sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make, use, or sell the patented article, in the market, at a reasonable profit." *Applied Medical Resources Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006) (quotations omitted). The reasonable royalty must leave the infringer with a reasonable opportunity for some profit. *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed. Cir. 1983) ("that a reasonable royalty would leave an infringer with a reasonable profit ... is implicit....").

In *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 895 F.2d 1403 (Fed Cir. 1990), the Federal Circuit rejected an expert's opinion that the defendant would agree to a 20-25% reasonable royalty in excess of its expected 15% net profit as "absurd" *Id.* at 1408; *see* BLACK'S LAW DICTIONARY (9th Ed.) ("Net profit" is "the amount arrived at by deducting from total sales the costs of goods sold and all expenses."). Recently, in *Brine, Inc. v. STX, L.L.C.*, 367 F.Supp.2d 61 (D. Mass. 2005) (Gorton, J.), this Court explained that an infringer's net profits are relevant to an award of compensatory infringement damages (like a "fair royalty"), but that gross profits (i.e., total sales minus costs of goods sold) are relevant to "imposing a penalty" on an infringer. *Id.* at 71.

In this case, Mr. Gemini seeks to maximize plaintiff's damages and impose a penalty upon Cardiogenesis by calculating a "reasonable" royalty based solely on Defendant's gross profits and to ignore operating income. Gemini Report at 22-23 (through infringed patents, Cardiogenesis had "ability to realized millions of dollars in sales and gross profits"). The result of Mr. Gemini choice is a "reasonable" royalty of $9.6 million. Vegh Dec., Ex. "B", Gemini Report at ¶¶ 44, 49. Gemini's approach is particularly troubling in view of his own acknowledgement that virtually all of the revenues (ninety percent (90%)) earned by

Cardiogenesis companywide from 2002 to 2007 were generated by the sales of the Accused Products. Vegh Dec., Ex "B", Gemini Report at Schedule 5.

By selecting gross profits and ignoring operating income, Mr. Gemini could ignore Cardiogenesis' operating expenses and associated losses for purposes of evaluating the profitability of the Accused Products during the relevant damages time period of 2002 to 2007. Mr. Gemini could also ignore that Cardiogenesis' had net profits for only two of the six years in the relevant period. *See* income statement for Cardiogenesis from 1999-2007, Tab 7 to Jarosz Report (Vegh Dec, Ex. "E".). As well, Mr. Gemini could ignore that his proposed 10% royalty rate of gross profits would more than eliminate all of Cardiogenesis' corporate profits earned on sales between 2002 and 2007. Such cherry-picking without any justification is not the "sound economic and factual predicates" that patent courts require of experts. *Riles,* 298 F.3d at 1311.

Nowhere, however, does Mr. Gemini explain why he chose to ignore Cardiogenesis' operating income. Mr. Gemini could not identify a single peer reviewed publication supporting the proposition that the proper measure of determining the profitability of a product made under a patent is to only consider the gross profits as opposed to operating profits derived from the sale of products accused of infringement. Vegh Dec., Ex. "A", Gemini Depo at 135:6-136:5. Nor could he identify a single treatise or peer reviewed article that states it is proper to look only at the gross profits the accused products and to ignore the operating profits derived from the sale of the accused products. Vegh Dec., Ex. "A", Gemini Depo at 136:18-137:13. Nor could Mr. Gemini identify any professional accounting engagement or seminar he has attended which discussed in some form that the proper measure of profitability of a product made under a patent would be solely the gross profits derived from the sale of such products. Vegh Dec., Ex. "A", Gemini Depo at 137:14-24.

Essentially, Mr. Gemini could not identify **any** authority that supports his opinion that the proper measure of reasonable royalty should ignore the alleged infringer's net income. Vegh Dec., Ex. "A", Gemini Depo at 139:9-23. Mr. Gemini's failure to explain his choice of a gross

profit calculation justifies exclusion of this opinion testimony because he has not demonstrated that his methodology of considering only gross profits has been subject to any testing, peer review, or adoption by other accounting professionals or patent damages experts. *See Uniloc*, 632 F.3d at 1315 ("[O]ne major determinant of whether an expert should be excluded under *Daubert* is whether he has justified the application of a general theory to the facts of the case.").

This Court should not allow Mr. Gemini to impose his desired punishment and apply his inflated rate to gross profit figures that would render it economically unreasonable for Cardiogenesis to enter into a hypothetical licensing arrangement. *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001) ("an actual infringer's profit margin can be relevant to the determination of a royalty rate in a hypothetical negotiation"); *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984) (noting that "actual profits [are] generally … probative of … anticipated profits.").

C.    **Gemini's Opinions Are Contrary To His Own Professional Practices**

A key test for all expert testimony is whether the expert is exercising the same degree of intellectual rigor in reaching his in-court opinion as he would be expected to in his out-of-court professional life. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (*Daubert's* reliability requirement ensures "that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."); *Bricklayers and Trowel Trades Int'l Pension Fund*, 2012 WL 118486 at *3 (Gorton, J.) (same). For example, in *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183 (7th Cir. 1993), the expert accountant used a discounted cash flow analysis by which he assessed value solely on the basis of net, rather than potential, cash flow, even though this was not "that methodology that experts in valuation find essential." *Id.* at 186. The appeals court faulted the trial court for failing to exclude the expert's valuation as patently inconsistent with well-accepted accounting principles in his own profession. *Id.*

In his deposition, Mr. Gemini readily acknowledged that in preparing income statements

for various corporate clients, the presentation of the results of the company's operations would likely include a statement of operating profits. Vegh Dec., Ex. "A", Gemini Depo at 77:5-19. When Mr. Gemini performs a financial audit wherein he relies on the income statement, his review would necessarily include the operating profits and losses of the company in determining whether the income statement is fairly presented under GAAP Rules. See Vegh Dec., Ex. "A", Gemini Depo at 79:1-80:8. Likewise, in his preparation of tax returns for corporate clients, Mr. Gemini will frequently transfer operating expense information in the form of research and development expenses, general administrative expenses, and sales expenses provided by the client in preparing such returns. *Id.* at 80:9-82:11.

Exclusion is justified further because – contrary to established law – Mr. Gemini ignored the economic and factual realities in the marketplace. In his final assessment, Mr. Gemini paid no attention to the critical facts of the operating losses resulting from the sale of the Accused Products and focused only on the gross profits generated by such products. Consistent with his professional work outside litigation, Mr. Gemini recognized that research and development, and general and administrative expenses are typical operating expenses for a company. *See* Vegh Dec., Ex. "A", Gemini Depo at 100:14-101:2. He acknowledged that in evaluating the profitability of the Accused Products that comprise ninety percent (90%) of the company-wide revenue of Cardiogenesis, R&D expenses should be allocated to the Accused Products in evaluating their profitability. *See* Vegh Dec., Ex. "A", Gemini Depo at 125:21-126:11. Further, Mr. Gemini did not know whether the amounts spent on R&D, salaries and employee benefits, and sales, general and administrative expenses by Cardiogenesis during the relevant time period were a one-time expense for products that would not need to be spent again or whether they were recurring expenses that would need to be spent again in future years on existing products. *Id.* at 262:5-20, 267:7-268:16. Where, as here, sound economic and factual predicates are absent from his reasonable royalty analysis, Rule 702 requires this Court to exclude Mr. Gemini's opinions concerning the profitability of the Accused Products.

Accordingly, in his final assessment of the reasonable royalty appropriate in this matter,

Mr. Gemini's selective and deliberate ignoring of Cardiogenesis' operating history and expenses contradicts typical measures he would take in the performance of accounting services for his out-of-court clients. This lack of intellectual vigor justifies his exclusion. *See Kumho Tire*, 526 U.S. at 152.

**D.**     **Gemini Should Be Precluded From Offering An Opinion Regarding The Application Of The Book Of Wisdom**

Defendant's expert John Jarosz in his evaluation of reasonable royalty damages in this matter identified a three-year gap between the date of the hypothetical negotiation between the parties (February 1999) and the date on which damages first accrued (February 2002). The parties do not dispute the date of the hypothetical negotiation and the first date of damages accrued in this case. Due to Plaintiff's significant delay in the filing of this patent infringement suit against Cardiogenesis, the three-year gap between the date of the hypothetical negotiation and the start of the damages period creates a three-year window of opportunity in which Cardiogenesis could have developed a non-infringing product to avoid any royalty obligation to CardioFocus during the damages period from 2002-2007. *See* Vegh Dec., Ex. "E", Jarosz Report, p. 53.

Given the challenges associated with the application of the hypothetical negotiation construct, the Federal Circuit has noted that "the willing licensee/licensor approach must be flexibly applied as a 'device in the aide of justice'." *TWM Manufacturing Co. v. Dura Corp.*, 789 F.2d 895, 900 (Fed. Cir. 1986). One particular dimension of flexibility that is incorporated into the analysis of a hypothetical negotiation is consideration of the "book of wisdom," which considers "facts and circumstances that may have occurred after the time of infringement in determining what negotiators would have decided at that time." *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988) ("experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within"); *see* Bryan W. Butler, Patent Infringement: Compensation and Damages, Law Journal Press (2009), at §4.02 (Vegh Dec., Ex. "F").

Here, Defendant's expert John Jarosz has by inference applied the book of wisdom in his consideration of the significant delay by Plaintiff in its filing of the instant lawsuit when evaluating reasonable royalty damages in this case. That is, Defendant's expert framed the key Cost Approach/Design Around Question as follows: "Would Cardiogenesis have been able to develop a commercially viable, non-infringing alternative to its accused products by February 2002, if it would have been aware in February 1999 that failure to do so would result in substantial royalty obligations to CardioFocus?"[6] Vegh Dec., Ex. "E", Jarosz Report, pp. 52-54.[7] Mr. Jarosz reaches this conclusion based on his understanding that Cardiogenesis would have been able to (and would have chosen to) design around the patents-in-suit and would have been able to modify and replace its laser system with a commercially acceptable, non-infringing product prior to February 2002. Based on the approximated $250,000 design-around cost, the motivation to pursue the design-around alternative would have been high for Cardiogenesis in view of the 10% royalty rate proposed by Mr. Gemini and the expected overall size of the potential market. *See* Vegh Dec., Ex. "E", Jarosz Report at 54. In reaching the foregoing conclusions, Mr. Jarosz has implemented the book of wisdom concept in his consideration of the fact that Plaintiff delayed the filing of the instant action over nine years after the date of the hypothetical negotiation.

---

[6] Based on the testimony offered by other defense experts in this matter, Mr. Jarosz concluded that the most that would be owed by Cardiogenesis to CardioFocus in the event of a finding of infringement of the '073 patent would be reasonable royalty damages not exceeding the design-around cost of an alternative fiber, such costs totaling no more than $250,000.

[7] Mr. Gemini is unable to provide a response to the key cost approach/design-around question posed by Mr. Jarosz, namely whether Cardiogenesis would have been able to develop a commercially viable, non-infringing alternative to its accused products by February 2002, if it had been aware in February 1999 that failure to do so would result in substantial royalty obligations to CardioFocus. Vegh Dec., Ex. "A", Gemini Deposition, 315:21-23. Nor can Mr. Gemini comment on whether it would be appropriate for Cardiogenesis to analogize the time it took Cardiogenesis to complete the development and regulatory approval for its Solargen 2100S product to the length of tiem it would have taken to complete development and get regulatory approval for an alternative non-infringing design. Vegh Dec., Ex. "A", Gemini Deposition, 330:10-19. Accordingly, Mr. Gemini should be precluded from offering any opinions at trial that concern these two issues as well.

Plaintiff's expert has given no consideration to whether the three-year delay between the hypothetical negotiation date and the damages accrual date in this case could affect the reasonable royalty rate under the hypothetical negotiation proposed by Mr. Jarosz. Vegh Dec., Ex. "A", Gemini deposition, 165:12-19; 168:2-13; 169:3-23. Significantly, Mr. Gemini can point to no case law or any authority in adopting and interpreting the book of wisdom that would preclude its application to considering a three-year design-around window between the hypothetical negotiation and the damages accrual date for evaluating a reasonable royalty rate. Vegh Dec., Ex. "A", Gemini deposition, 163:5-23. In fact, as discussed above, the Federal Circuit has stated in no uncertain terms that there should be "no rule of law" that would forbid consideration of the delay by Plaintiff in its filing of this action in the manner proposed by Mr. Jarosz's reasonable royalty analysis. *Fromsom*, 853 F. 2d at 1575. Despite having been provided a copy of Mr. Jarosz's report over a month prior to his deposition, Mr. Gemini had not reviewed or otherwise researched any case law interpreting the book of wisdom to determine whether or not the three-year delay between the hypothetical negotiation and the recoverable damages period may be considered in arriving at a reasonable royalty determination. Vegh Dec., Ex. "A", Gemini Depo at 153:22-154:16, 162:15-20.[8]

Accordingly, Mr. Gemini should be precluded from offering any statutory, decisional, or other authorities that implicate in any way that the book of wisdom as applied by Mr. Jarosz in finding a three-year window for a design-around based on the delay between the hypothetical negotiation and the first date of accrual of damages in determining a reasonable royalty in this case. Mr. Gemini's failure to cite any such authority during his deposition renders any trial testimony on the subject impermissible new opinion. If Mr. Gemini is not precluded from giving

---

[8] Other than reviewing the deposition transcript of Mr. Jarosz and other defense witnesses, Mr. Gemini had not specifically planned on conducting any further work in this matter apart from preparing for trial. Vegh Dec., Ex. "A", Gemini Deposition, 19:19-22, 44:12-24. Other than the additional depositions he may review, Mr. Gemini has identified all bases and assumptions that he will rely upon in forming the opinions he is providing in this matter. Vegh Dec., Ex. "A", Gemini Deposition, 350:12-16.

any proposed new testimony in this case, Cardiogenesis should be granted leave to depose him beforehand.

## CONCLUSION

For all of the foregoing reasons, significant parts of the proferred testimony and expert report of Plaintiff's damages expert, Joseph Gemini, should be excluded as unreliable, arbitrary, and irrelevant under *Daubert* and Federal Rules of Evidence 401, 402, 403, 702, and 703.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), Cardiogenesis hereby requests a hearing on the issues raised herein.

Respectfully submitted,

Dated:  May 29, 2012                    CARDIOGENESIS CORPORATION,

By its attorneys,

/s/Bart L. Kessel
Bart Kessel (pro hac vice)
Bart.kessel@tuckerellis.com
Tucker Ellis LLP
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223
Tel: (213) 430-3400
Fax: (213) 430-3409

-and-

Matthew A. Newboles (pro hac vice)
mnewboles@stetinalaw.com
William J. Brucker (pro hac vice)
wbrucker@stetinalaw.com
Stephen Z. Vegh (pro hac vice)
svegh@stetinalaw.com
Benjamin N. Diederich (pro hac vice)
bdiederich@stetinalaw.com
Stetina Brunda Garred & Brucker
75 Enterprise, Suite 250
Aliso Viejo, CA 92656
Tel: (949) 855-1246
Fax: (949) 855-6371

-and-

/s/Douglass C. Lawrence
Douglass C. Lawrence (BBO#657362)
dclawrence@daypitney.com
Day Pitney LLP
One International Place
Boston, MA  02110
Tel: (617) 345-4600
Fax: (617) 345-4745

795356                                   19

### CERTIFICATE OF SERVICE

I, Douglass C. Lawrence, hereby certify that on this 29th day of ~~January~~ May, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

/s/Douglass C. Lawrence
Douglass C. Lawrence

T:\Client Documents\CRDIO\095L\Trial\Daubert Motion

795356

20